UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Grace Chadderton Richards,

                          Plaintiff,          09-CV-1663
                                              (CPS)

          - against -
                                              MEMORANDUM OPINION
Janet Napolitano, Secretary of the U.S.       AND ORDER
Department of Homeland Security, John P.
Torres, Acting Assistant Secretary, U.S.
Immigration and Customs Enforcement, and
Michael Aytes, Acting Deputy Director,
U.S. Citizenship and Immigration Services,

                          Defendants.

----------------------------------------X

SIFTON, Senior Judge.

     On April 22, 2009, plaintiff Grace Chadderton Richards

commenced this action against defendants Janet Napolitano,

Secretary of the United States Department of Homeland Security,

John P. Torres, Acting Assistant Secretary of United States

Immigration and Customs Enforcement, and Michael Aytes, Acting

Deputy Director of United States Citizenship and Immigration

Services ("USCIS").  Plaintiff claims that defendants' actions

violated her statutory rights under the Immigration and

Nationality Act, 8 U.S.C. § 1101 *et seq.* ("INA"), as well as the

standards set forth in the Administrative Procedures Act, 5

U.S.C. § 701 *et seq.* ("APA").  Plaintiff seeks declaratory and

injunctive relief as well as a writ of mandamus under the

Mandamus Act, 28 U.S.C. § 1361, *inter alia*, enjoining USCIS from

determining that plaintiff is no longer a "spouse" within the

meaning of 8 U.S.C. § 1151(b)(2)(A)(i), and directing USCIS to reopen her I-130 petition and I-485 application and to adjudicate them on the merits. Plaintiff also seeks an award of costs and reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*

Presently before this Court are the parties' submissions in response to my Order dated April 27, 2009, directing them to show cause why the relief requested in plaintiff's petition should not be granted. For the reasons set forth below, plaintiff's requests for declaratory judgment, mandamus relief, and injunctive relief are granted in part and denied in part, and her request for costs and attorney's fees is denied without prejudice.

**BACKGROUND**

The following undisputed facts are drawn from plaintiff's Complaint and Petition for Writ of Mandamus ("Compl."). Plaintiff was born in Barbados in 1956. Compl. ¶ 11. She visited the United States numerous times under the terms of a multiple-entry, non-immigrant visitor's visa issued in 1995. *Id.* During a visit to the United States in 2000, plaintiff was introduced to Mr. Ricky Richards, a natural-born citizen of the United States, by Mr. Richard's cousin. *Id.* ¶ 12. They eventually began and maintained a long-distance romantic relationship for several years. *Id.*

Sometime after July 31, 2004, Mr. Richards proposed marriage to plaintiff. *Id.* ¶ 13. Plaintiff accepted and moved in with Mr. Richards and his mother in December of 2004. *Id.* On July 28, 2005, plaintiff and Mr. Richards married in Brooklyn, New York. *Id.* ¶ 12. Plaintiff continues to reside with Mr. Richard's mother. *Id.*

On January 25, 2006, Mr. Richards filed with the United States Citizenship and Immigration Services ("USCIS") an I-130 alien relative petition (the "I-130 petition") on plaintiff's behalf, and on the same day, plaintiff filed an I-485 application (the "I-485 application") to adjust her status to that of a lawful permanent resident. *Id.* ¶ 15. In connection with the I-130 petition and the I-485 application, an officer of USCIS conducted an interview of plaintiff and Mr. Richards on August 8, 2006. *Id.* ¶ 18. The couple appeared on the scheduled date, but no decision was made on either the I-130 petition or the I-485 application.[1] *Id.* At the conclusion of the interview, the USCIS officer marked plaintiff's passport "pending" and advised plaintiff and Mr. Richards that they would be notified of a decision by mail. *Id.*

---

[1] The parties dispute whether the plaintiff's and Mr. Richard's responses to the USCIS officer's questions during the interview created doubts as to whether their marriage was bona fide. This dispute is immaterial, however, because whether the marriage was bona fide is not at issue here.

On September 18, 2006, Mr. Richards died. *Id.* ¶ 19. At
some point following Mr. Richards' death, USCIS directed
plaintiff and Mr. Richards to appear for a second interview on
July 9, 2007. *Id.* ¶ 20. Plaintiff retained counsel and appeared
at the second interview, where she presented Mr. Richards' death
certificate to agency officials. *Id.* ¶ 21. During the
interview, the adjudicating officer explained to plaintiff that
it was the agency's policy to deny I-130 petitions where the
citizen spouse had died prior to the two-year anniversary of the
marriage. *Id.* ¶ 22. At the conclusion of the interview, the
officer advised plaintiff that she would receive a denial notice
in the mail. *Id.*

By notice dated February 4, 2009, and by decision dated
February 6, 2009 (the "Decision"), USCIS denied the I-130
petition without addressing whether the marriage was bona fide.
Instead, USCIS stated that it "has no authority to approve an
alien relative petition after the petitioner's death." *Id.* ¶ 24,
*see also id.* Ex. A (copy of notice and attached decision). The
agency relied on two cases decided by the Board of Immigration
Appeals ("BIA") in concluding that it was "constrained to deny
the petition." *Id.* Ex. A. Further, the Decision noted that even
if no BIA precedent existed on the issue of a petitioner's death
while a petition is pending, the INA required USCIS to deny the
petition because following Mr. Richards' death, plaintiff no

longer qualified as an "immediate relative" within the meaning of the INA as she ceased to be the "spouse" of a United States citizen at that time. *Id.*

There is no dispute that USCIS routinely grants I-130 petitions and I-485 applications filed on behalf of aliens who have been married to United States citizens for less than two years. *Id.* ¶ 26.

By Notice to Appear ("NTA") dated April 4, 2009, USCIS commenced removal proceedings against plaintiff. *Id.* ¶ 28; *see also id.* Ex. B (copy of NTA). A hearing in these proceedings has been scheduled for July 9, 2009.[2] *Id.* The NTA alleges, *inter alia*, that plaintiff "remained in the United States beyond January 30, 2005, without authorization from the [USCIS]," and charges plaintiff with being removable from the United States pursuant to section 237(a)(1)(B) of the INA, "in that after admission . . . [she] remained in the United States for a time longer than permitted, in violation of [the INA]." *Id.*; 8 U.S.C. § 1227(a)(1)(b). The Immigration Judge who will preside over the July 9, 2009 hearing has authority to order plaintiff's removal

_____

[2] At oral argument on June 25, 2009, the government represented that in light of the Department of Homeland Security's recent decision to defer removal proceedings initiated against widow(er)s like plaintiff who were denied "immediate relative" classification solely on account of their spouse's death before the two-year anniversary of their marriage, pending issuance of guidance regarding the widow(er)'s legal status, the government was prepared to request an adjournment of the July 9, 2009 hearing. However, the government was unable to indicate the length of the adjournment it was prepared to seek, nor did it state that its position with regard to the denial of plaintiff's I-130 petition and her placement in removal proceedings had in any way changed.

from the United States. *Id.* ¶ 34. However, the Immigration
Judge lacks jurisdiction over the I-130 petition and lacks
authority to compel USCIS to reconsider its denial of the I-130
petition or the I-485 application. *Id.* Plaintiff does not
qualify for any form of relief from removal. *Id.* ¶ 35.
Therefore, absent appropriate relief from this Court, the
Immigration Judge would be compelled to order plaintiff's removal
from the United States. *Id.*

## DISCUSSION

I.  Jurisdiction

       Although the parties have not raised the issue, I note that
this Court has subject matter jurisdiction under 28 U.S.C. §
1331, which grants courts general federal question jurisdiction,
and Section 704 of the APA, 5 U.S.C. § 704, to review the meaning
of the terms "immediate relative" and "spouse" as they appear in
8 U.S.C. § 1151(b)(2)(A)(i). Because these are purely legal
questions which do not implicate agency discretion, the INA's
jurisdictional bar, 8 U.S.C. § 1252(a)(2)(B)(ii), which precludes
judicial review of most discretionary immigration decisions, does
not apply in this case. *See Arar v. Ashcroft*, 414 F.Supp.2d 250,
267-73 (E.D.N.Y. 2006) (citing, *inter alia*, *Sepulveda v.
Gonzales*, 407 F.3d 59 (2d Cir. 2005)). Further, for reasons
stated more fully below, this Court has mandamus jurisdiction
pursuant to 28 U.S.C. § 1361.

II.  Standard of Review

The APA empowers courts to "hold unlawful and set aside" not only agency actions and conclusions that are "arbitrary" or "capricious," but also agency actions and conclusions that are "otherwise not in accordance with law" or are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  "When the agency action is based on an interpretation of its governing statute, [courts] must consider whether that interpretation is entitled to deference and, if so, how much."  *N.Y. Public Interest Research Group v. Whitman*, 321 F.3d 316, 324 (2d Cir. 2003) (citing, *inter alia*, *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (mandatory deference); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) (deference according to persuasiveness)).  If "the statutory text is plain and unambiguous," however, the court "must apply the statute according to its terms."  *Carcieri v. Salazar*, 129 S.Ct. 1058, 1063-64 (2009).  In other words, no deference is due to an agency's interpretation that contravenes Congress' unambiguously expressed intent.  *Whitman*, 321 F.3d at 324.

III. Statutory and Regulatory Background

A United States citizen who seeks to gain lawful permanent resident ("LPR") status for an alien family member must begin the process by filing an I-130 petition with USCIS on behalf of the

alien family member, seeking classification of the alien as the
citizen's "immediate relative."  8 U.S.C. §§ 1151(b)(2)(A)(i),
1154(a)(1)(A)(i); 8 C.F.R. § 204.1(a)(1).  The INA defines
"immediate relatives" as follows:

> For purposes of this subsection, the term "immediate
> relatives" means the children, spouses, and parents of a
> citizen of the United States, except that, in the case of
> parents, such citizens shall be at least 21 years of age.
> In the case of an alien who was the spouse of a citizen of
> the United States for at least 2 years at the time of the
> citizen's death and was not legally separated from the
> citizen at the time of the citizen's death, the alien . . .
> shall be considered, for purposes of this subsection, to
> remain an immediate relative after the date of the citizen's
> death but only if the spouse files a petition under section
> 1154(a)(1)(A)(ii) of this title [an I-360 petition] within 2
> years after such date and only until the date the spouse
> remarries.

8 U.S.C. § 1151(b)(2)(A)(i).  If a United States citizen spouse
dies without filing a petition on behalf of an alien spouse, an
alien spouse "described in the second sentence of section
1151(b)(2)(A)(i)" -- *i.e.*, "who was the spouse of a citizen of
the United States for at least 2 years at the time of the
citizen's death and was not legally separated from the citizen at
the time of the citizen's death" -- may also file a petition for
classification as an immediate relative on Form I-360.  8 U.S.C.
§ 1154(a)(1)(A)(ii); 8 C.F.R. §§ 204.1(a)(2), 204.2(b).

During the course of adjudicating an I-130 or an I-360
petition, USCIS must conduct an investigation to determine
whether "the facts stated in the petition are true and . . . the
alien in behalf of whom the petition is made is an immediate

relative[.]"  8 U.S.C. § 1154(b).  Approval of an I-130 or an I-360 petition turns on whether the marriage relationship was bona fide "at its inception."  *Matter of McKee*, 17 I&N Dec. 332 (BIA 1980) (establishing that parties' intent at time of marriage controls whether marriage was bona fide); *see also Huaracaya v. Mukasey*, 550 F.3d 224, 231 (2d Cir. 2008) ("we agree with the government that marriage-based visa eligibility has always meant that a petitioner had to demonstrate that [the] marriage was bona fide").  If the facts stated in the petition are true and the alien qualifies as an "immediate relative," USCIS "shall" approve the petition.  8 U.S.C. § 1154(b).

Approval of an I-130 or I-360 petition classifies the alien "immediate relative" within a specific immigrant class, and permits the alien to apply for an immigrant visa if the alien is abroad, or to seek adjustment of status to that of a lawful permanent resident if the alien is present in the United States. 8 U.S.C. §§ 1201(a)(1), 1202(a), 1255(a).  If, however, after the I-130 or I-360 petition is approved, USCIS later determines that the alien is not an "immediate relative," the petition may be revoked effective as of the date it was approved.  *See* 8 U.S.C. § 1155 (providing for petition revocation upon a finding of "good and sufficient cause").

An alien seeking adjustment of status must file an I-485 application, which may be filed concurrently with an I-130 or I-

360 petition or thereafter. 8 U.S.C. § 1255(a); 8 C.F.R. §§
245.1(a), 245.2(a)(2)(i)(B) & (C). Approval of the I-485
application, which is within the discretion of USCIS, results in
the conferral of LPR status.

IV. <u>Analysis</u>

This matter turns on whether plaintiff should be able to
qualify as an "immediate relative" of her late husband under 8
U.S.C. § 1151(b)(2)(A)(i), despite the fact that her husband died
before the two-year anniversary of their marriage. If so, then
USCIS's denial of the I-130 petition solely on account of her
husband's untimely death was not in accordance with law. At the
outset, I note the existence of a difference of opinion among
appellate courts in cases involving the same issue and virtually
identical facts. The First, Sixth, and Ninth Circuits have
concluded that, for the purposes of § 1151(b)(2)(A)(i), a
surviving spouse should be able to qualify as an "immediate
relative" if her deceased spouse filed an I-130 petition on her
behalf. *See Taing v. Napolitano*, --- F.3d ---, 2009 WL 1395836
(1st Cir. May 20, 2009); *Lockhart v. Napolitano*, 561 F.3d 611
(6th Cir. 2009); *Freeman v. Gonzales*, 444 F.3d 1031 (9th Cir.
2006). In contrast, the Third Circuit, with one judge
dissenting, has ruled otherwise. *Robinson v. Napolitano*, 554
F.3d 358 (3d Cir. 2009). The Second Circuit has not yet had
occasion to rule on this issue.

A.   *Interpretation of the Relevant Statute*

1)   *Text and Structure of Statute*

As set forth above, the relevant portion of the INA provides

that:

> [T]he term "immediate relatives" means the children,
> spouses, and parents of a citizen of the United States,
> except that, in the case of parents, such citizens shall be
> at least 21 years of age.  In the case of an alien who was
> the spouse of a citizen of the United States for at least 2
> years at the time of the citizen's death and was not legally
> separated from the citizen at the time of the citizen's
> death, the alien . . . shall be considered, for purposes of
> this subsection, to remain an immediate relative after the
> date of the citizen's death but only if the spouse files a
> petition under section 1154(a)(1)(A)(ii) of this title [an
> I-360 petition] within 2 years after such date and only
> until the date the spouse remarries.

8 U.S.C. § 1151(b)(2)(A)(i).

The starting point for interpretation of a statute "is

always its language." *Cmty. for Creative Non-Violence v. Reid*,

490 U.S. 730, 739 (1989).  "Interpretation of a word or phrase

depends upon reading the whole statutory text, considering the

purpose and context of the statute, and consulting any precedents

or authorities that inform the analysis." *Dolan v. U.S. Postal

Service*, 546 U.S. 481, 486 (2006).  In understanding and applying

a regulatory scheme, courts should interpret statutes to be

coherent and internally consistent.  *See FDA v. Brown &

Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

The plain language of the first sentence of §

1151(b)(2)(A)(i) expressly includes "spouses" within the

definition of "immediate relatives." In that first sentence,
only "parents" are subject to any limitation in qualifying as
"immediate relatives," as their citizen children must be at least
21 years of age in order for them to qualify. There is no
comparable qualifier for the term "spouses." Therefore, I must
assume that Congress intended no limitation on that term beyond
the requirement set forth elsewhere in the INA that both parties
be present for the marriage ceremony.[3] *See Taing*, 2009 WL
1395836 at *6; *Lockhart*, 561 F.3d at 616; *Freeman*, 444 F.3d at
1039 (quoting *Keene Corp. v. U.S.*, 508 U.S. 200, 208 (1993)
("[W]here Congress includes particular language in one section of
a statute but omits it in another . . . , it is generally
presumed that Congress acts intentionally and purposely in the
disparate inclusion or exclusion.")).

   The government argues, however, that the second sentence of
§ 1151(b)(2)(A)(i) must be read together with the first sentence
in order to determine the meaning of the word "spouse" in the
first sentence. In the government's view, the second sentence
controls whether and when alien widows and widowers may qualify
as "immediate relatives." Therefore, according to the
government, the second sentence expressly modifies the term

---

   [3] In the definition section of the INA, the term "spouse" is negatively
defined only to the extent it excludes "a spouse, wife, or husband by reason
of any marriage ceremony where the contracting parties thereto are not
physically present in the presence of each other, unless the marriage shall
have been consummated." 8 U.S.C. § 1101(a)(35).

"spouses" in the first sentence to exclude from the definition of
"immediate relatives" those alien widows and widowers who were
not married to a United States citizen for at least two years at
the time of the citizen's death.  In support of this argument,
the government relies on a case decided in the Southern District
of New York in 1999, as well as the Third Circuit's recent
decision in *Robinson*.  *See Burger v. McElroy*, No. 97 CIV. 8775,
1999 WL 203353, at *5 (S.D.N.Y. 1999) (the second sentence of §
1151(b)(2)(A)(i) "specifically addresses when widows and widowers
of U.S. citizens will be considered 'immediate relatives'");
*Robinson*, 554 F.3d at 365 ("the second sentence [of §
1151(b)(2)(A)(i)] qualifies which spouses of deceased citizens
are immediate relatives").  I am unpersuaded by this argument for
several reasons.

The appellate courts in *Taing*, *Lockhart*, and *Freeman*
concluded that the second sentence of § 1151(b)(2)(A)(i), rather
than modifying the first sentence as the government contends, is
most logically read as creating a separate and independent right
for certain alien spouses to self-petition for "immediate
relative" status.  I agree.  This reading flows more naturally
from the text and structure of the statute.  As the First Circuit
noted in *Taing*, the second sentence "addresses the situation of
an alien spouse whose husband or wife died before filing an I-130
petition . . . . There is nothing in the language of the second

sentence to imply that it was intended to strip away 'spouse'
status from a surviving spouse whose deceased spouse had already
filed an I-130 petition." *Taing*, 2009 WL 1395836, at *7.[4]

In addition, this reading is supported by the statute's
context within the INA.  First, 8 U.S.C. § 1154, which, as its
caption indicates, governs the "[p]rocedure for granting
immigrant status," likewise sets forth dual processes for
citizens and certain alien spouses to petition for classification
of aliens as "immediate relatives."  Section 1154(a)(1), which
sets forth who may file petitions, provides both that "any
citizen of the United States claiming that an alien is entitled
to . . . an immediate relative status . . . may file a petition,"
*see* 8 U.S.C. § 1154(a)(1)(A)(i), and that "[a]n alien spouse
described in the second sentence of section 1151(b)(2)(A)(i) of
this title *also* may file a petition[.]"  8 U.S.C. §
1154(a)(1)(A)(ii) (emphasis added).  Both the *Freeman* and *Taing*
courts found the use of the word "also" in this provision
significant.  *See Freeman*, 444 F.3d at 1042 n.17 ("The inclusion
of the word 'also' in this subsection, as compared to the right

---

[4] The government argues that the tense of the second sentence of §
1151(b)(2)(A)(i) in referring to "an alien who *was* the spouse of a citizen"
(emphasis added) supports the conclusion that the term "spouses" in the first
sentence cannot include aliens whose citizen spouses are deceased.  This
reading, however, does not take account of the context of the phrase "an alien
who was the spouse of a citizen."  When viewed in context, the past-tense term
"was" clearly relates to the marriage durational requirement for a self-
petitioning widow(er), *i.e.*, that he or she must have been the spouse of a
citizen "for at least 2 years at the time of the citizen's death" in order to
self-petition.  Therefore, the use of the term "was" does not, as the
government contends, imply that plaintiff is no longer a "spouse."

given to living citizen spouses . . . further establishes that

the right of self-petition is given to a select group of alien

widows as an alternative to their citizen spouse's I-130

filing."), *cited in Taing*, 2009 WL 1395836, at *7.  Thus, the

language and structure of § 1154(a)(1)(A)(i) & (ii) support the

conclusion that the second sentence of § 1151(b)(2)(A)(i) confers

a separate right of self-petition on certain alien spouses,

rather than modifying the right of citizens to petition on behalf

of their alien spouses.  *See Freeman*, 444 F.3d at 1041-42 ("The

distinction the regulations draw between the rights of a citizen

spouse to petition as compared to those of an alien widow to

self-petition is consistent with a congressional intent to create

two different processes, such that one or the other applies --

either the citizen spouse petitions or, if he dies without doing

so, the alien widow may do so."), *cited in Lockhart*, 561 F.3d at

617; *see also Taing*, 2009 WL 1395836 at *7.[5]

---

[5] While I do not rely on the fact, as I find that the text of §
1151(b)(2)(A)(i) is plain and unambiguous, I further note that the legislative
history of §§ 1151 and 1154 supports the conclusion that Congress intended to
create a separate right for certain alien spouses to self-petition for
"immediate relative status" when it added the second sentence of §
1151(b)(2)(A)(i).  The second sentence was added as part of the 1990
amendments to the INA.  *See* Immigration Act of 1990, Pub. L. 101-649, § 101,
104 Stat. 4978, 4981 (1990).  Prior to those amendments, alien widows and
widowers had no right to self-petition for classification as "immediate
relatives."  The procedural provision in § 1154 to which the second sentence
of § 1151(b)(2)(A)(i) referred at the time it was added in 1990 was
subsequently altered the next year to provide that "[a]n alien described in
the second sentence of section [1151](b)(2)(A)(i) also may file a petition
with the Attorney General under this subparagraph for classification under
such section."  *See* Miscellaneous and Technical Immigration and Naturalization
Amendments of 1991, Pub. L. 102-232, § 302(e)(4)(A), 105 Stat. 1733, 1745
(1991).  The logical conclusion is that § 1154 was altered to clarify the
procedure by which the new right described in § 1151 was to be implemented.

The provisions set forth in 8 U.S.C. § 1186a further support
this conclusion.  Section 1186a was enacted as part of the
Immigration Marriage Fraud Amendments of 1986, which were
intended to prohibit fraudulent marriages.  *See* Pub. L. No. 99-
639, 100 Stat. 3537 (1986); *Azizi v. Thornburgh*, 908 F.2d 1130,
1137 (2d Cir. 1990) (Cardamone, J., dissenting).  Under § 1186a,
an alien who marries a United States citizen may receive
permanent resident status as an "immediate relative" only on a
conditional basis prior to the two-year anniversary of the
qualifying marriage.  Section 1186a(b)(1)(A) permits termination
of that status if it is found that the marriage "(i) was entered
into for the purpose of procuring an alien's admission as an
immigrant, or (ii) has been judicially annulled or terminated,
*other than through the death of a spouse*[.]"  8 U.S.C.
1186a(b)(1)(A)(i)-(ii) (emphasis added).  As both the *Freeman* and
*Taing* courts noted, by excepting a spouse's death, the language
of § 1186a(b)(1)(A)(ii) presents "compelling evidence that
Congress did not intend its provision for a widow's self-petition
for adjustment of status to have an implicit collateral
consequence of terminating a spouse's already pending petition --
particularly when the effect would be to foreclose a grieving

---

Far from being superfluous, as the government argues must be the case under
plaintiff's reading of § 1151, the 1991 and subsequent revisions to § 1154
expressly including certain alien spouses among those who may file petitions
support the conclusion that Congress did not intend the second sentence of §
1151(b)(2)(A)(i) to alter the citizen spouse's right described in the first.

widow from any adjustment at all 'through the death of [her]
spouse.'" *Freeman*, 444 F.3d at 1042, *cited in Taing*, 2009 WL
1395836 at *7.[6]

Mindful that in interpreting § 1151(b)(2)(A)(i), I must
"determine whether the language at issue has a plain and
unambiguous meaning," which involves an inquiry into "the
language itself, the specific context in which that language is
used, and the broader context of the statute as a whole," I find
that the language of § 1151(b)(2)(A)(i), viewed by itself and
read together with § 1154 and § 1186a, plainly and unambiguously
demonstrates Congress' intent to make alien spouses eligible for
"immediate relative" classification upon petition of a citizen
spouse, regardless of whether the citizen spouse dies before the
petition is adjudicated, as well as to provide for a separate
right of self-petition for certain alien spouses.  Accordingly, I

---

[6] The government argues that the exception for marriages terminated
"through the death of a spouse" set forth in § 1186a(b)(1)(A)(ii) is
irrelevant to the interpretation of § 1151(b)(2)(A)(i).  According to the
government, the "death of a spouse" exception was created to distinguish
between marriages which may have been fraudulent and marriages which were
likely bona fide.  Generally speaking, there is a greater likelihood that a
marriage was fraudulent if it is terminated within two years than if it is not
terminated during that time.  However, if the reason for the termination
within two years was the death of a spouse, the likelihood that the marriage
was fraudulent is substantially reduced.  According to the government, because
the "death of a spouse" exception deals solely with the substantive issue of
whether a marriage is lawful, it cannot support plaintiff's contention that
she meets the threshold requirement of qualifying as a "spouse" within the
meaning of the "immediate relatives" definition set forth in the first
sentence of § 1151(b)(2)(A)(i).  I disagree.  Like the *Freeman* court, I find
that the "death of a spouse" exception in § 1186a(b)(1)(A)(ii) is further
evidence of Congress' intent not to foreclose an alien spouse from adjustment
of status purely on account of the death of the citizen spouse.  *See Freeman*,
444 F.3d at 1042.

need not defer to USCIS' interpretation of the statute. *N.Y.
Public Interest Research Group v. Whitman*, 321 F.3d 316, 324 (2d
Cir. 2003).

2) *Ordinary Meaning of "Spouse"*

In addition, the ordinary meaning of the term "spouse"
supports my conclusion that plaintiff continues to be a "spouse"
within the meaning of the first sentence of § 1151(b)(2)(A)(i).
In construing a term in a statute, courts look to "the language
employed by Congress and [assume] that the ordinary meaning of
that language accurately expresses the legislative purpose."
*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541
U.S. 246, 252 (2004) (citation omitted).  Where Congress has not
defined a term, in determining the term's ordinary meaning,
courts refer to dictionary definitions.  *See id.* (citing the
dictionary definition of a term appearing in the relevant
statute).

As previously mentioned, the INA provides no affirmative
definition of the term "spouse."  *See supra* n.3.  At the time the
second sentence of § 1151(b)(2)(A)(i) was added in 1990, the
definition of the term "spouse" that appeared in the then-current
edition of Black's Law Dictionary was as follows:[7]

---

[7] The parties have relied on the version of Black's Law Dictionary
current as of 1990 in discussing the meaning of the term "spouse."  Adopting
the reasoning employed by the First Circuit in *Taing*, I also rely on that
version.  *See Taing*, 2009 WL 1395836, at *5 n.4 ("We rely on the sixth edition
[of Black's Law Dictionary], as opposed to an earlier edition, because it
logically follows that Congress, when amending the statute, intended for the

> **Spouse.** One's husband or wife, and "surviving spouse" is one of a married pair who outlives the other.

*Black's Law Dictionary* 1042 (6th ed. 1990).  Plaintiff, as "one of a married pair who outlives the other," qualifies as a "surviving spouse."  Because this term is subsumed within the dictionary definition of "spouse," it follows that plaintiff is a "spouse" within the ordinary meaning of that term.

Despite the plain language of the dictionary definition of "spouse," however, the government contends that a "surviving spouse" should not be considered a "spouse" as that term is used in the first sentence of § 1151(b)(2)(A)(i) because, elsewhere in the INA, Congress has distinguished between "spouse" and "surviving spouse."[8]  This argument is unpersuasive.  The fact that Congress at times clarified the type of spouse to which other INA provisions refer by employing the term "surviving spouse" does not affect the meaning of the term "spouse" where, in context, that term can only logically be interpreted to mean "surviving spouse."  In the second sentence of § 1151(b)(2)(A)(i), for instance, an alien who "was the spouse of a citizen of the United States for at least 2 years at the time of

---

term "spouse" in the first sentence to carry the same meaning as it does in the second sentence.").

[8] Specifically, the government refers to 8 U.S.C. §§ 1101(a)(27)(H) and (I)(ii) (definitions of "special immigrant"); 8 U.S.C. §§ 1430(a), (b), & (d) (naturalization of certain individuals); 8 U.S.C. § 1439(g) (naturalization through service in the armed forces); 8 U.S.C. § 1612(a)(2)(C)(iii) (eligibility of aliens for certain federal programs); 8 U.S.C. § 1613(b)(2)(C) (eligibility for federal means-tested public benefits); 8 U.S.C. § 1622(b)(3)(C) (eligibility for certain state programs).

the citizen's death" can only logically be understood to be a
"surviving spouse," although only the term "spouse" is employed
throughout the provision.[9]  Further, given that Congress used the
term "spouse" in the first sentence of § 1151(b)(2)(A)(i) to
refer to a living spouse, while the same term can only mean
"surviving spouse" in the second sentence, "[t]he fact that
within the same subsection, Congress uses the word 'spouse' to
refer to a living spouse and a surviving spouse lends support to
the argument that it intended for 'spouse' to include surviving
spouse." *Taing*, 2009 WL 1395836, at *6 (citing *Freeman*, 222 F.3d
at 1039-41; *Robinson*, 554 F.3d at 369 (Nygaard, J. dissenting)).

     Similarly, the government contends that Congress did not
intend for a "surviving spouse" to qualify as a "spouse" because
it knows how to provide for a familial relationship to continue
after death for immigration purposes, and has done so with regard
to other relationships.  In support of this argument, the
government points primarily to the INA's definition of "parent"
in 8 U.S.C. § 1101(c)(2), which expressly includes "deceased
parent."  As the government concedes, however, the INA contains
no useful definition of the term "spouse," which suggests that
Congress intended for the ordinary meaning of the term "spouse"

---

[9]  The second sentence of § 1151(b)(2)(A)(i) employs the term "spouse"
three times in a way that can only be understood to mean "surviving spouse,"
lending further support to the conclusion that a "surviving spouse" is a type
of "spouse."

to control. As previously discussed, the ordinary meaning of "spouse" includes "one of a married pair who outlives the other," or "surviving spouse."

Finally, the government argues that plaintiff is no longer a "spouse" because her marriage ended upon the death of her husband. The concept that marriage ends upon the death of one spouse is well established under New York law. *See Hallinckx v. Stenbeck*, 762 N.Y.S.2d 903, 903 (2d Dep't 2003) ("It is well-settled that the death of one party to a divorce action prior to judicial determination dissolving the marriage causes the action to abate since the marital relationship between the parties no longer exists.") (citing *Cornell v. Cornell*, 7 N.Y.2d 164, 169 (N.Y. 1959)). But the issue here is not whether plaintiff remains legally married; rather, it is whether she qualifies as a "spouse." The fact that plaintiff's marriage reached its legal conclusion upon her husband's death does not control whether plaintiff remains her deceased husband's "spouse," as that term is commonly understood.

3)   *Result of Interpretation of Statute*

It is a cardinal rule of statutory construction that "[a] statute should be interpreted in a way that avoids absurd results." *U.S. v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000); *see also Clinton v. N.Y.*, 524 U.S. 417, 419 (1998) ("Acceptance of the Government's new-found reading . . . would produce an absurd

and unjust result which Congress could not have intended"). Each
of the *Freeman*, *Lockhart*, and *Taing* courts, as well as the
dissenting judge in *Robinson*, concluded that the government's
reading of § 1151(b)(2)(A)(i) would "create[] an arbitrary,
irrational and inequitable outcome in which approvable petitions
will be treated differently depending solely upon when the
government grants the approval." *Taing*, 2009 WL 1395836, at *10
(quoting *Lockhart*, 561 F.3d at 620 (quoting *Robinson*, 554 F.3d at
371 (Nygaard, J., dissenting))); *see also Freeman*, 444 F.3d at
1043 ("an alien's status as a qualified spouse should not turn on
whether DHS happens to reach a pending application before the
citizen spouse happens to die"). I agree that Congress did not
intend for plaintiff, whose properly filed I-130 petition was
eligible for approval prior to her husband's death, to be
penalized simply because USCIS did not happen to adjudicate her
petition before she became a widow.[10] As Judge Nygaard
colorfully concluded in his dissent in *Robinson*:

> [I]t is inconceivable to me that Congress intended an
> alien's status to be contingent upon the amount of time that
> the executive department takes to process a timely and
> proper petition -- a factor completely outside of the
> control of the alien. . . . Nor do I believe that Congress
> intended to sanction the disregard that the department has

_____

[10] In so holding, I need not determine whether USCIS engaged in undue
delay in adjudicating plaintiff's I-130 petition. The issue is not whether
USCIS is at fault for not addressing the petition in a timely manner. Rather,
the issue is whether Congress intended the timing of USCIS's adjudication
process to control whether an alien whose United States citizen spouse dies
before the two-year anniversary of the marriage is eligible to qualify as an
"immediate relative." I conclude that it did not.

shown towards persons like [plaintiff]. She has committed
no crime. She is innocent of any misbehavior. She is a
grieving widow . . . . This same department whose delay or
inaction forecloses [plaintiff]'s chance of becoming an
American, now so diligently pursues the avenues of her
expulsion. . . . My view . . . is that it is untoward of
this nation of immigrants, we who have passed through the
portals of citizenship, to coldly and impassively slam the
door behind us on innocent aspirants who dream to follow.

*Robinson*, 554 F.3d at 371 (Nygaard, J., dissenting).

B.    *Government's Remaining Arguments*

The government's remaining arguments are unpersuasive in
light of my conclusions above.  I consider each in turn.

1)    *Present Tense Language Employed by § 1154(b)*

The government contends that the present-tense language of
another provision of the INA, 8 U.S.C. § 1154(b), implies that an
alien widow or widower is not a "spouse" for the purposes of the
first sentence of § 1151(b)(2)(A)(i).  Section 1154(b) provides,
*inter alia*, that, after a citizen spouse files an I-130 petition,
USCIS cannot approve the petition unless it determines (1) "that
the facts stated in the petition *are* true"; and (2) that the
alien "*is* an immediate relative" (emphasis added).  According to
the government, and as the Third Circuit found in *Robinson*,
Congress' use of the present-tense words "are" and "is" in §
1154(b) "makes plain that the facts in the petition -- including
the alien's spousal status -- must be true at the time USCIS
decides the petition."  *Robinson*, 554 F.3d at 363; *see also*
*Burger v. McElroy*, No. 97 CIV. 8775, 1999 WL 203353, at *5

(S.D.N.Y. 1999) (discussing BIA's interpretation of § 1154(b) "to require that the immediate family relation exist at the time the petition is adjudicated" and concluding that this was not "an impermissible construction of the statute").

While I agree with the *Robinson* court that § 1154(b) requires the facts set forth in the I-130 petition to be true at the time the petition is adjudicated, this conclusion does not affect my holding in light of my conclusion above that a surviving spouse remains a "spouse" for the purposes of § 1151(b)(2)(A)(i). Thus, because plaintiff is still a spouse, her eligibility to qualify as an immediate relative is unaffected by her husband's death. *See Taing*, 2009 WL 1395836, at *8 ("the use of the present tense in § 1154(b) does not affect our analysis because [plaintiff] still qualifies as 'an immediate relative' despite her husband's death"); *Lockhart*, 561 F.3d at 620.

2) *Automatic Revocation*

The government also relies on 8 U.S.C. § 1155 to support its reading of § 1151(b)(2)(A)(i). The statute now codified at § 1155, which was originally enacted in 1952,[11] permits the Secretary of Homeland Security, for "good and sufficient cause," to "revoke the approval of any petition approved by him under section 1154 of this title." 8 U.S.C. § 1155. The Executive

_____

[11] *See* Immigration and Nationality Act of 1952 ("1952 Act"), Pub. L. 82-414, §§ 206, 407, 66 Stat. 163, 181, 281 (1952).

Branch has long taken the position that the death of a citizen
petitioner automatically revokes approval of an I-130 petition,
an approach now codified at 8 C.F.R. § 205.1(a)(3)(i)(C)(2).  The
government argues that because Congress twice reenacted the
statute presently codified at § 1155 without changing its
relevant provisions,[12] Congress is deemed to have adopted the
longstanding administrative interpretation of § 1155 that the
death of a citizen petitioner results in automatic revocation of
the approval of the petition.  *See Boeing v. U.S.*, 537 U.S. 437,
456 (2000) ("The fact that Congress did not legislatively
override [a regulation] in enacting [an associated statute]
serves as persuasive evidence that Congress regarded that
regulation as a correct implementation of its intent.").
Therefore, the argument goes, since the death of the citizen
petitioner revokes the approval of an I-130 petition, it follows
that the petitioner's death when the I-130 petition is pending
warrants denial of the petition.[13]

This argument is flawed for at least two reasons.  First, by
its terms, Section 1155 applies only to approved petitions,

_____

[12] *See* Immigration and Nationality Act of 1965, Pub. L. 89-236, § 5, 79
Stat. 911, 915 (1965); Intelligence Reform and Terrorism Prevention Act of
2004, Pub. L. 108-458, § 5304(c) 118 Stat. 3638, 3736 (2004).

[13] The government concedes that this principle is, of course, subject to
the exception for an alien beneficiary who was married to the citizen
petitioner for at least two years at the time of the petitioner's death.  8
U.S.C. § 1151(b)(2)(A)(i).  There is no dispute that this exception does not
apply here.

whereas the I-130 petition at issue here was pending at the time it was denied. Like the courts in *Taing* and *Lockhart*, I am not convinced that it is appropriate to "extend a regulation that applies to the revocation of approved petitions to the pending petition context." *Taing*, 2009 WL 1395836, at *8 (citing *Lockhart*, 561 F.3d at 622). Second, in light of my conclusion that Congress did not intend the untimely death of a citizen petitioner to control an alien spouse's ability to qualify as an "immediate relative," the government's reading of § 1155's application to pending petitions is contrary to congressional intent. "Where a regulation conflicts with congressional intent as expressed in a statutory scheme, courts must give effect to congressional intent." *Id.* at *9; *see also Perales v. Thornburgh*, 967 F.2d 798, 809 (2d Cir. 1992), *vacated on other grounds*, 509 U.S. 917 (1993). Further, as the Sixth Circuit noted in *Lockhart*:

> Congress may have had a reasonable basis to permit the DHS to revoke approved petitions, but not permit the denial of pending petitions. Under the regulations, the DHS has discretion to refrain from automatically revoking an approved petition for humanitarian reasons. See 8 C.F.R. 205.1(a)(3)(i)(C)(2). There is no such relief available to alien spouses if the pending petition for adjustment of status is denied upon the death of their citizen spouses.

*Lockhart*, 561 F.3d at 621-22. Therefore, the government's reading of § 1155 denies alien surviving spouses like plaintiff the opportunity to qualify for discretionary relief from automatic revocation of the approval of their I-130 petitions.

The result is the creation of a "regulatory crevice" into which bona fide surviving spouses of United States citizens "will be dropped." *Robinson*, 554 F.3d at 370-71 (Nygaard, J., dissenting). I do not believe Congress intended to create any such regulatory crevice. Accordingly, for the reasons stated above, Section 1155 does not support the government's reading of § 1151(b)(2)(A)(i).

3) *Effect of BIA Precedent*

Finally, the government contends that I must defer to the BIA's decision in *Matter of Varela*, 13 I & N Dec. 453 (BIA 1970). In *Varela*, the BIA held that an alien ceases to be the "spouse" of a United States citizen when the citizen, petitioning on the alien's behalf, dies before the petition is adjudicated, and therefore that the alien cannot qualify as an "immediate relative." *Id*. at 453-54. As explained above, however, I conclude that the language of § 1151(b)(2)(A)(i) clearly and unambiguously indicates that Congress intended for surviving spouses like plaintiff to be eligible to qualify as "immediate relatives." Therefore, I need not accord defer to the BIA's decision in *Varela*. Further, I agree with and hereby adopt the First Circuit's reasoning on this issue in *Taing*:

> [W]e conclude that the language, text, structure, and
> context of the INA statutory scheme plainly and
> unambiguously indicate that Congress intended for surviving
> spouses such as [plaintiff to] qualify for "immediate
> relative" status for purposes of § 1151(b)(2)(A)(i); thus,
> we need not accord *Chevron* deference to the BIA's decision

in *Varela*. Even if we were to consider *Varela* under the
less deferential standard articulated in *Skidmore v. Swift &
Co.*, 323 U.S. 134 (1944), it fails to persuade us for two
main reasons. *See Lockhart*, 561 F.3d at 622 (holding that
*Varela* is not entitled to either *Skidmore* or *Chevron*
deference). First, the opinion summarily rules in favor of
the government and does not engage in an adequate analysis
of the statutory text. *See id.; Freeman*, 444 F.3d at 1038.
Second, the BIA later found this decision to be
extra-jurisdictional in *Matter of Sano*, 19 I & N Dec. 299
(BIA 1985), thereby making *Varela* a non-precedential
decision. *See Lockhart*, 561 F.3d at 622; *Freeman*, 444 F.3d
at 1038.

*Taing*, 2009 WL 1395836, at *9. Therefore, I need not defer to
the BIA's decision in *Varela*.

Accordingly, for the reasons stated above and in light of
the plain meaning of 8 U.S.C. § 1151(b)(2)(A)(i), plaintiff has
shown that defendants, in denying her I-130 petition on the basis
that she is no longer a "spouse" and thus ineligible for
classification as an "immediate relative," took an action based
on a conclusion that was "not in accordance with law," in
violation of the APA. 5 U.S.C. § 706(2)(A).

V.  Requested Relief

Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §
2201(a), which is proper "(1) where the judgment will serve a
useful purpose in clarifying and settling the legal relations in
issue; or (2) when it will terminate and afford relief from the
uncertainty, insecurity and controversy giving rise to the
proceedings." *Maryland Cas. Co. v. Rosen*, 445 F.2d 1012, 1014
(2d Cir. 1971) (citation omitted). Given my conclusion that

Congress intended for plaintiff to be eligible to qualify as an "immediate relative" given that she is a "spouse" as that term is employed in the first sentence of § 1151(b)(2)(A)(i), and in light of USCIS's contrary determination and resultant denial of plaintiff's I-130 petition, I find that a declaratory judgment would alleviate the uncertainty over the legality of USCIS's actions and conclusions.  Accordingly, as set forth in the Order accompanying this memorandum opinion, plaintiff's request for declaratory judgment is granted.

Plaintiff also seeks mandamus relief pursuant to 28 U.S.C. § 1361, which provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  "[M]andamus is an extraordinary remedy that is 'granted only in the exercise of sound discretion.'"  *Miller v. French*, 530 U.S. 327, 340 (2000) (citing *Whitehouse v. Illinois Central R. Co.*, 349 U.S. 366, 373 (1955)).  "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if [s]he has exhausted all other avenues of relief and only if the defendant owes [her] a clear nondiscretionary duty."  *Heckler v. Ringer*, 466 U.S. 602, 616 (1984); *accord Anderson v. Bowen*, 881 F.2d 1, 5 (2d Cir. 1989).

Here, I am satisfied that plaintiff has exhausted all

administrative avenues of relief available to her prior to
bringing this action. In addition, while it is well settled that
"matters solely within the discretion of the INS" are "not
reviewable" under § 1361, *see Huli v. Way,* 393 F.Supp.2d 266, 270
(S.D.N.Y. 2005) (citations omitted), the meaning of the terms
"immediate relative" and "spouse" as they appear in 8 U.S.C. §
1151(b)(2)(A)(i) are purely legal questions which do not
implicate agency discretion. There is no dispute that defendants
owe a "clear nondiscretionary duty" to plaintiff to adjudicate
her I-130 petition and I-485 application in accordance with law.
*See, e.g.*, *Hoo Loo v. Ridge*, No. 04 CV 5553, 2007 WL 813000, at
*3 (E.D.N.Y. Mar. 14, 2007) ("numerous courts have found that
immigration authorities have a non-discretionary duty to
adjudicate applications"). Because defendants' interpretation of
"immediate relative" and "spouse" when they denied plaintiff's
petition was not in accordance with law, mandamus relief
directing defendants to adjudicate plaintiff's I-130 petition and
I-485 in accordance with law is appropriate in the terms set
forth in the accompanying Order.

In addition, plaintiff seeks to enjoin the agency from
determining that she is no longer a "spouse" such that she is
ineligible for immediate relative classification under the INA,
and from denying the I-130 petition and/or the I-485 application
on that basis. "A party seeking preliminary injunctive relief

must establish (1) either (a) a likelihood of success on the merits of its case as (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, *and* (2) a likelihood of irreparable harm if the requested relief is denied." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007) (emphasis in original).[14]  The standard for a permanent injunction is the same as that for a preliminary injunction except that the plaintiff must establish actual success, rather than merely a likelihood of success on the merits.  *See, e.g.*, *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007).  Plaintiff has shown that defendants, in denying her I-130 petition, took an action based on a conclusion that was "not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A).  She has therefore established actual success on the merits.  In addition, defendants do not dispute that absent injunctive relief, plaintiff faces mandatory

---

[14] In its reply submission, the government mistakenly argues that in *Munaf v. Geren*, the Supreme Court eliminated the "serious questions going to the merits" and "balance of hardships" prong of the well established test for a preliminary injunction, instead requiring a plaintiff in all cases to show a likelihood of success on the merits.  128 S.Ct. 2207, 2219 (2008).  This argument represents, at the very least, a serious misunderstanding of the Supreme Court's holding in *Munaf*.  In that case, rather than doing away with the "serious questions" prong, the Court simply held that a preliminary injunction may not issue upon a finding that the *jurisdictional* issues in a case present serious questions giving rise to a fair ground for litigation. Rather, a court must consider the merits of the stated claims for relief before issuing a preliminary injunction.  *See id.* ("[W]e hold that it was an abuse of discretion for the District Court to grant a preliminary injunction on the view that the 'jurisdictional issues' in Omar's case were tough, without even considering the merits of the underlying habeas petition.").

deportation, which qualifies as "irreparable injury." *Jayaraj v.*
*Scappini,* 66 F.3d 36, 39 (2d Cir. 1995) (irreparable harm is an
"injury for which a monetary award cannot be adequate
compensation"). Accordingly, plaintiff is entitled to injunctive
relief in the terms set forth in the accompanying Order.

Plaintiff further seeks to enjoin defendants from making
certain allegations and charges and taking certain actions during
her removal proceedings. However, 8 U.S.C. § 1252(g) bars courts
from hearing claims arising from the placement of an alien in
removal proceedings.[15] "While the statute creates an exception
for 'constitutional claims or questions of law,' . . .
jurisdiction to review such claims is vested exclusively in the
courts of appeals[.]" *Ajlani v. Chertoff*, 545 F.3d 229, 235 (2d
Cir. 2008). Accordingly, I am without jurisdiction to grant the
requested relief.

Finally, plaintiff seeks a declaratory judgment that she has
a right to an Employment Authorization Document ("EAD") and a
mandamus order compelling USCIS to issue an EAD to her upon her
application. She also seeks costs and reasonable attorney's fees
pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et
seq.* Neither of these issues have been briefed by the parties,

---

[15] 8 U.S.C. § 1252(g) provides, in relevant part, as follows: "[N]o
court shall have jurisdiction to hear any cause or claim by or on behalf of
any alien arising from the decision or action by the Attorney General to
commence proceedings, adjudicate cases, or execute removal orders against any
alien under this chapter."

and therefore, I lack a basis upon which to grant the requested relief. Accordingly, the requested relief is denied.

### CONCLUSION

For the reasons set forth above, plaintiff's requests for declaratory judgment, mandamus relief, and injunctive relief are granted in part and denied in part, and her request for costs and attorney's fees is denied without prejudice. The Clerk is hereby directed to transmit a copy of the within to the parties and to the assigned Magistrate Judge.


SO ORDERED.

Dated:    Brooklyn, NY
          June 29, 2009


                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge